# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of:<br><br>S.M.<br><br>Appellant. | No. 57820-4-II<br><br>UNPUBLISHED OPINION |

LEE, J. — S.M. appeals an order authorizing the involuntary administration of antipsychotic medication. S.M. argues that the superior court commissioner violated S.M.'s due process rights when it failed to make a "medical appropriateness" finding and that the commissioner made an inadequate substituted judgment. Because a finding of medical appropriateness is not required in a civil commitment proceeding and the superior court commissioner appropriately identified a compelling state interest, the necessity of the treatment, and considered S.M.'s desires and concerns in making its substituted judgment, we affirm the order.

FACTS

A.    BACKGROUND

In August 2021, S.M. was arrested and charged with second degree attempted arson. Police had responded to a 911 call of S.M. breaking out a car's windows with a baseball bat. When the police arrived, S.M. was "'screaming incoherent things'" and grabbed a pair of bolt cutters, with which he continued to hit the car. Clerk's Papers (CP) at 8. The police then observed S.M. pull out a cigarette lighter and light it while holding it up to the open gas cap of the car.

The superior court ordered S.M. to undergo a competency evaluation to determine if he could proceed to trial on his charge. Psychiatric staff determined that S.M. "lacked the requisite capacities to proceed to trial due to a diagnostic impression of Unspecified Schizophrenia." CP at 10.

In September 2021, the superior court ordered S.M. to undergo a 45-day competency restoration period at Western State Hospital (WSH). After the 45-day competency restoration period, WSH determined that S.M. continued to lack capacity to proceed to trial. The superior court ordered an additional competency restoration period for 90 days. After 90 days, WSH determined S.M. still lacked capacity to proceed to trial. In his report, the WSH psychiatrist who evaluated S.M. wrote:

> Based upon a review of [S.M.]'s available records, the current evaluation, and a review of risk factors, . . . he is currently at an *elevated* risk for reoffending and dangerous behavior. [S.M.]'s risk for both future dangerousness and re-offending would <u>significantly increase</u> should he engage in substance use or discontinue psychotropic medication. Further, if housed in an unstable setting with limited support or means to provide for himself, [S.M.] could experience increased stress and associated decompensation.
> . . . [S.M. has] a history of arrests, convictions, and incarceration periods since at least 2014 in Arkansas, Oklahoma, Colorado, and California.

CP at 12 (emphasis and underlining in original).

In April 2022, S.M.'s attempted arson charge was dismissed and he underwent a civil commitment evaluation. In May 2022, S.M.'s treating psychiatrist and psychologist jointly filed a 180-day involuntary treatment petition on the basis of S.M.'s grave disability and his substantial likelihood of repeating criminal acts due to a behavioral health disorder. The superior court granted the petition.

No. 57820-4-II

In July 2022, S.M.'s treating psychiatrist, Dr. Nitin Karnik, filed a petition for involuntary treatment with antipsychotic medication (medication petition). The medication petition alleged that S.M. suffers from schizoaffective mania. The medication petition further stated that S.M. had

> recently threatened, attempted or caused serious harm to others. Treatment with antipsychotic medication will reduce the likelihood that [S.M.] will cause serious harm to others; failure to treat [S.M.] with antipsychotic medication may result in the likelihood of serious harm or substantial (further) deterioration.
> [S.M.] has been displaying [d]elusions and paranoia. He [t]elephoned the White House threatening the US President and was subsequently interviewed by the Secret Service a few weeks ago. He has threatened [p]eers on the ward and also threatened staff.

CP at 35.

According to Dr. Karnik, alternatives to antipsychotic medication, such as "milieu therapy" and "seclusion and/or restraints" would be more likely to prolong S.M.'s involuntary commitment or would be more intrusive to S.M.'s liberty and privacy interests. CP at 36. S.M. refused antipsychotic medications because he did not believe he needed any. S.M. did not express any religious objections to taking medication, and he has no known family members.

B.     MEDICATION HEARING

In August 2022, the superior court commissioner held a hearing on the medication petition. Dr. Karnik and S.M. testified.

1.     Dr. Karnik's Testimony

Dr. Karnik is a psychiatrist at WSH. Dr. Karnik had daily observations and interactions with S.M. Dr. Karnik testified that he had diagnosed S.M. with schizophrenia affective disorder. This diagnosis was based on S.M.'s presentation of delusional thinking and statements, including S.M.'s statements that he was a CIA and FBI agent. Dr. Karnik testified that S.M. also exhibited paranoid delusions and aggressive behavior:

3

> [S.M.] has accused other patients about things that they may have said to him or things that . . . he thinks may have said about other peers or other staff, and he has assaulted peers in response to such delusional beliefs. . . . He has delusions and paranoia along with the mood component affective disorder where he becomes aggressive and angry and agitated.

Verbatim Rep. of Proc. (VRP) at 12.

Dr. Karnik observed S.M. remove a mirror from the ceiling of the ward and throw a sharp object at staff. S.M. has directly threatened to kill Dr. Karnik and made bizarre statements to Dr. Karnik, such as "'You're going to be deported to Qatar.'" VRP at 10. S.M. at one time called and made threats to the White House, which prompted the Secret Service to contact WSH and interview S.M. and WSH staff. Based on the nature of S.M.'s threats and assaultive behavior, Dr. Karnik speaks with S.M. only through plexiglass or with security present. Dr. Karnik also testified that WSH staff observed S.M. pick up a heavy, weighted chair and throw it from a height. S.M. has assaulted fellow patients and security at WSH, which resulted in S.M.'s placement in restraints and in seclusion.

S.M. had been on antipsychotic medication from November 2021 to June 2022. However, S.M. had stopped taking medication approximately four to five weeks prior to the medication hearing, when S.M.'s detention at WSH switched from a competency restoration order to a civil commitment order. When S.M. had been on medication, the antipsychotic drug Zyprexa,[1] he had not exhibited physical aggression. Dr. Karnik sought to treat S.M. with Zyprexa, which would "eliminate delusions, eliminate hallucinations, eliminate paranoia." VRP at 17. It would also function as a mood stabilizer. If Zyprexa was ineffective, Dr. Karnik also requested use of Haldol,

---

[1] Zyprexa is the trade name for Olanzapine. The record refers to Zyprexa and Olanzapine interchangeably.

an older antipsychotic that controls delusions, paranoia, and aggression. Dr. Karnik noted that Haldol also has a mood stabilizing effect even though it is not approved as a mood stabilizer by the Food and Drug Administration (FDA). Dr. Karnik stated:

> [Haldol] does not have an FDA label for a mood stabilizing effect because when the medication was first invented 40 years ago, they did not do the studies to prove that it works as a mood stabilizer and now it's off label, generic, so there's no money in trying to submit those studies; but we know that it works.

VRP at 18.

Dr. Karnik believed medication would help S.M. and hoped to stabilize S.M. sufficiently to allow him to be transferred to the less restrictive "civil side" of WSH. VRP at 19. WSH's "civil side" has refused to accept S.M. based on "his dangerousness" and "his untreated status." VRP at 19. The ward where S.M. is currently housed is "a complete lockdown unit; it's an extension of the jail." VRP at 19. Dr. Karnik testified that without medication, S.M.'s "physical issues and the psychosocial issues would continue to deteriorate." VRP at 22. Medication would help control any brain deterioration and assist S.M. in becoming "more goal-directed in his thinking, less delusional or at least to the point that the delusions would not make him act out in . . . an aggressive manner." VRP at 22-23.

Dr. Karnik discussed the medications with S.M., and both Dr. Karnik and a WSH pharmacist discussed the medications' side effects with S.M. Side effects include muscle stiffness or tremors, and long-term effects may lead to increased appetite, which could ultimately cause high blood pressure, diabetes, and "'metabolic syndrome.'" VRP at 20. However, Dr. Karnik stated that a dietitian is assigned to each ward to closely monitor patients' cholesterol and blood sugar levels. Another potential side effect is tardive dyskinesia, a movement disorder. However, it is rare, and Dr. Karnik has not seen a new case of tardive dyskinesia in 20 years. Furthermore,

S.M. did not exhibit any side effects when he had previously taken Zyprexa, nor did he inform Dr. Karnik of side effects when they discussed medication. Dr. Karnik testified that S.M.'s only expressed reason for not wanting medication was simply that S.M. did not believe he needed any. Additionally, S.M. did not express any religious objections to medication to Dr. Karnik.

2. S.M.'s Testimony

According to S.M., he did not see Dr. Karnik every day. S.M. expressed concern about side effects of antipsychotic medication. He testified that he suffered from headaches, insomnia, agitation, and leg restlessness as a result of taking Zyprexa. However, S.M. then appeared to state that he had such symptoms prior to taking Zyprexa. S.M. later stated that Zyprexa caused him "'brain ring'" and "'headache.'" VRP at 36. S.M. also expressed concern about dementia and memory loss as a result of taking Lithium, a mood stabilizer.

Additionally, S.M. stated that he was concerned that Haldol was "FDA 'not approved' medicine." VRP at 37. S.M. further stated, "Haldol's got a lawsuit—a class-action lawsuit for billions and billions of dollars that gives men low testosterone, and then they produce man boobs; Haldol does. It changes the cortisol in the brain; that's what Haldol does." VRP at 38. S.M. did not understand why he was at WSH. During his testimony, S.M. continually attempted to ask Dr. Karnik confirmation questions about his treatment at WSH and how he might obtain a "fair and speedy trial." VRP at 40.

3. Commissioner's Ruling and Order

The superior court commissioner found by clear, cogent, and convincing evidence that the State had a compelling interest in involuntarily administering antipsychotic medication to S.M. The commissioner issued an order authorizing involuntary treatment with antipsychotic

6

medication and incorporated its oral ruling into the order. In its oral ruling, the commissioner stated in part:

> The requested medication, the antipsychotic, in Dr. Karnik's observation, did successfully treat and manage [S.M.]'s aggressive behavior and assaultiveness without side effects that were verbalized to Dr. Karnik. . . . [R]esuming antipsychotic medication would, hopefully, address those assaultive and aggressive behaviors, again, such that [S.M.] could transfer to the civil ward which would be a less restrictive environment . . . with additional treatment and programming opportunities. . . .
>
> Absent treatment with an antipsychotic to get [S.M.] more stabilized . . . the only other treatment options to address his current symptoms would be use of seclusion and restraints which are much more intrusive to [S.M.]'s liberty and, also, would likely lead to a prolonged commitment and a much longer period of commitment.
>
> As to [S.M.]'s own testimony regarding his concern for side effects, [S.M.] discussed concern as to Lithium. Lithium is not an order being sought today. [S.M.] expressed concern that Haldol is not FDA approved or that understanding is inconsistent, in my view, with Dr. Karnik's testimony; and the medication that is sought in the first place is Zyprexa, which Dr. Karnik testified the respondent had, previously, had a track record of success taking.
>
> I am persuaded that Dr. Karnik's testimony establishes that [S.M.] has refused his prescribed antipsychotic medication, and in the period of refusal, he has been engaged in assaultive behavior and aggressive and threatening behavior, has deteriorated and further decompensated that is in a way that endangers his health and safety and that his detention would be substantially prolonged absent treatment with the antipsychotics and those alternative treatments of seclusion and restraints are significantly more intrusive to [S.M.] himself.

VRP at 47-48.

The written order also stated: "The Respondent would consent to being treated with antipsychotic medication if the Respondent were capable of making a rational decision concerning treatment and this Court is hereby substituting its judgment for that of the Respondent." CP at 44. Additionally, the superior court commissioner noted that S.M. did not object to medication for any

7

religious or moral reasons, and that there is no known objection from any family members as there was no evidence of S.M.'s family presented.

S.M. appeals.

ANALYSIS

S.M. appeals the superior court commissioner's findings of fact, conclusions of law, and order authorizing involuntary treatment with antipsychotic medications. Specifically, S.M. argues that the commissioner violated his due process rights by failing to make a medical appropriateness finding and the commissioner inadequately substituted its judgment.[2] We disagree.

A. APPELLATE REVIEW

All acts and proceedings of court commissioners are subject to revision by the superior court. RCW 2.24.050. If a party does not move to revise within 10 days from the entry of the commissioner's order, then a commissioner's order becomes the order of the superior court. RCW 2.24.050. This court reviews the superior court's ruling, not the commissioner's decision. *In re Det. of L.K.*, 14 Wn. App. 2d 542, 550, 471 P.3d 975 (2020). Here, because no party moved to revise the commissioner's order, the commissioner's order has become that of the superior court.[3]

---

[2] S.M. assigns error to the commissioner's findings of fact 4, 5, and 6, and conclusions of law 10, 11, and 12. However, in the briefing of the issues, S.M. does not reference these specific assignments of error. A party's failure to provide argument and citation to authority in support of an assignment of error precludes appellate consideration of an alleged error. *Avellaneda v. State*, 167 Wn. App. 474, 485 n.5, 273 P.3d 477 (2012). Therefore, this opinion will address the actual arguments in S.M.'s brief.

[3] S.M.'s medication order has expired. However, this appeal is not moot because "an order to involuntarily administer antipsychotic medication . . . may have collateral consequences in future proceedings." *L.K.*, 14 Wn. App. 2d at 549; *accord In re Det. of P.R.*, 18 Wn. App. 2d 633, 644, 492 P.3d 236 (2021) (stating "the appeal of an order of involuntary administration of antipsychotic medicine is not moot because such an order may have collateral consequences in future proceedings.").

We review challenges to sufficiency of the evidence in a light most favorable to the State. *In re Det. of P.R.*, 18 Wn. App. 2d 633, 644, 492 P.3d 236 (2021). When the standard is clear, cogent, and convincing, a heightened standard applies and the court's findings "must be supported by evidence that makes the fact at issue highly probable." *Id.* at 645.

B.    INVOLUNTARY MEDICATION ORDER

1.    Legal Principles

Under the due process clauses of the Fourteenth Amendment of the U.S. Constitution and article 3, section 1 of the Washington Constitution, "[a] person has a liberty interest in avoiding the unwanted administration of antipsychotic medication." *Id.* at 643; *accord Washington v. Harper*, 494 U.S. 210, 221, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990) (an individual "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs."); *State v. Lyons*, 199 Wn. App. 235, 240, 399 P.3d 557 (2017) ("The liberty interest in avoiding the unwanted administration of antipsychotic drugs gives rise to both substantive and procedural due process considerations.").

An involuntarily committed individual has a right to refuse antipsychotic medication. *L.K.*, 14 Wn. App. 2d at 548; *see* RCW 71.05.217(1)(j). However, "the State can limit this right if the state interest is sufficiently compelling and the proposed treatment is both necessary and effective to further that interest." *P.R.*, 18 Wn. App. 2d at 643. An involuntarily committed individual may not refuse medication if "it is determined that the failure to medicate may result in a likelihood of serious harm or substantial deterioration or substantially prolong the length of involuntary commitment and there is no less intrusive course of treatment than medication in the best interest of that person." RCW 71.05.215(1).

9

If the State wishes to involuntarily administer antipsychotic medication to an individual, RCW 71.05.217 outlines the procedural safeguards that must be followed in light of the liberty interest at stake. The petitioning party must prove by clear, cogent, and convincing evidence a compelling State interest that justifies overriding a patient's lack of consent. RCW 71.05.217(1)(j)(i). Furthermore, the court must make specific findings of fact concerning the existence of at least one compelling interest, the necessity of the treatment, and the individual's desires regarding treatment. RCW 71.05.217(1)(j)(ii). A court must also find that "alternative forms of treatment are not available, have not been successful, or are not likely to be effective." RCW 71.05.217(1)(j)(i). If an individual is unable to make a "rational and informed decision" about the medication, the court must make a "substituted judgment." RCW 71.05.217(1)(j)(ii).

Washington courts have identified compelling State interests in "'(1) the preservation of life; (2) the protection of interests of innocent third parties; (3) the prevention of suicide; and (4) maintenance of the ethical integrity of the medical profession.'" *In re Det. of B.M.*, 7 Wn. App. 2d 70, 79, 432 P.3d 459 (internal quotation marks omitted) (quoting *In re Schuoler*, 106 Wn.2d 500, 508, 723 P.2d 1103 (1986)), *review denied*, 193 Wn.2d 1017 (2019).

As to a court's substituted judgment, "[t]he goal is not to do what most people would do, or what the court believes is the wise thing to do;" instead, the court must stand in the individual's position and consider "what this particular individual would do if [they] were competent and understood all the circumstances." *In re Guardianship of Ingram*, 102 Wn.2d 827, 839, 689 P.2d 1363 (1984). Courts should also consider the risk of adverse side effects, the ability of the individual to cooperate with post-treatment therapy, the wishes of family and friends, and the individual's religious or moral views, among other factors. *Id.* at 840. Medical professionals may

10

not "substitute their judgment for the procedures established by law to protect a person's substantial liberty interest in refusing antipsychotic medication." *L.K.*, 14 Wn. App. 2d at 552.

2.     Due Process and Medical Appropriateness

S.M. argues that because "[d]ue process . . . requires a finding of medical appropriateness before ordering forced medication of an involuntarily committed person," the superior court commissioner erred by not considering the potential side effects of the proposed medications. Br. of Appellant at 12. Because this is a civil commitment matter and not a criminal competency restoration matter, we disagree.

Here, S.M. cites to several cases to support his contention regarding the requirement of finding medical appropriateness, including *Riggins v. Nevada*,[4] *Lyons*, and *State v. Mosteller*.[5] *Riggins*, *Lyons*, and *Mosteller* all involve the involuntary administration of medication for competency restoration purposes so a defendant can stand trial. *See generally Riggins*, 504 U.S. at 129; *Lyons*, 199 Wn. App. at 237; *Mosteller*, 162 Wn. App. at 421. In such cases, courts consider the *Sell* factors, which include: "'the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of antipsychotic drug treatment.'" *Lyons*, 199 Wn. App. at 241 (quoting *Sell v. United States*, 539 U.S. 166, 183, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003)).

However, the *Sell* factors apply "solely for trial competence purposes in certain instances." *Sell*, 539 U.S. at 167; *accord Lyons*, 199 Wn. App. at 238 n.3 ("*Sell* establishes the requirements necessary for the State to obtain an order authorizing involuntary medication in order to restore

---

[4]  504 U.S. 127, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992).

[5]  162 Wn. App. 418, 254 P.3d 201, *review denied*, 172 Wn.2d 1025 (2011).

competency to stand trial."); *Mosteller*, 162 Wn. App. at 424-25 ("In rare circumstances, the State can forcibly administer unwanted medications solely for trial competency purposes. To order the administration of medications in such situations, however, the trial court must consider certain factors, which are known as the *Sell* factors." (internal citations omitted)). The issue of whether S.M. is competent to stand trial is not before this court.

S.M. is civilly committed under chapter 71.05 RCW. The applicable statute, which S.M. agrees, is RCW 71.05.217. RCW 71.05.217(1)(j) outlines what is required to ensure due process for civilly committed individuals and requires:

> The court shall make specific findings of fact concerning: (A) The existence of one or more compelling state interest; (B) the necessity and effectiveness of the treatment; and (C) the person's desires regarding the proposed treatment. If the patient is unable to make a rational and informed decision about consenting to or refusing the proposed treatment, the court shall make a substituted judgment for the patient as if he or she were competent to make such a determination.

RCW 71.05.217(1)(j)(ii). RCW 71.05.217 does not require a court to make a "medical appropriateness" finding. Indeed, RCW 71.05.217 does not once mention "medical appropriateness." *See* RCW 71.05.217. Accordingly, because S.M.'s competency to stand trial is not at issue and because RCW 71.05.217 does not require a medical appropriateness finding, the standards articulated in *Riggins*, *Lyons*, and *Mosteller* are inapplicable here.[6]

---

[6] Even if the *Sell* factors were applicable, the record shows that the order includes an adequate medical appropriateness finding:

> The requested medication, the antipsychotic, . . . did successfully treat and manage [S.M.]'s aggressive behavior and assaultiveness without side effects that were verbalized to Dr. Karnik. . . . [R]esuming antipsychotic medication would, hopefully, address those assaultive and aggressive behaviors, again, such that [S.M.] could transfer to the civil ward which would be a less restrictive environment . . . with additional treatment and programming opportunities. . . .

No. 57820-4-II

Because the superior court commissioner did not make a medical appropriateness finding, S.M. assumes that the commissioner did not follow procedure as outlined in RCW 71.05.217(1)(j). However, this assumption is not supported by the record.

Here, the superior court commissioner discussed S.M.'s need for antipsychotic medication to help prevent his aggressive and assaultive behavior. The commissioner also articulated that the alternatives to antipsychotic medication, such as use of restraints and seclusion, would be more intrusive to S.M.'s liberty interests. Finally, the commissioner acknowledged S.M.'s concerns about medication side effects, noted that S.M.'s primary concern was for the side effects of Lithium, a medication that the State did not seek to administer. Additionally, the commissioner found Dr. Karnik's testimony regarding Haldol more credible. "We do not disturb the superior court's findings 'if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing.'" *B.M.*, 7 Wn. App. 2d at 85 (quoting *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986)).

---

> Absent treatment with an antipsychotic to get [S.M.] more stabilized . . . the only other treatment options to address his current symptoms would be use of seclusion and restraints which are much more intrusive to [S.M.]'s liberty and, also, would likely lead to a prolonged commitment and a much longer period of commitment.

VRP at 47-48. The order also addressed S.M.'s concern regarding side effects:

> As to [S.M.]'s own testimony regarding his concern for side effects, [S.M.] discussed concern as to Lithium. Lithium is not an order being sought today. [S.M.] expressed concern that Haldol is not FDA approved or that understanding is inconsistent, in my view, with Dr. Karnik's testimony; and the medication that is sought in the first place is Zyprexa, which Dr. Karnik testified the respondent had, previously, had a track record of success taking.

VRP at 48.

S.M. appears to assert that Dr. Karnik, instead of the superior court commissioner, made the "medical appropriateness finding," which was error. Br. of Appellant at 15. S.M.'s contention is not supported by the record. Dr. Karnik, as S.M.'s treating psychiatrist, testified as an expert witness during the hearing and made a professional recommendation for S.M.'s treatment based on his firsthand knowledge of and interactions with S.M.

Because the medication order is not for the purpose of S.M. standing trial and because RCW 71.05.217 does not require a medical appropriateness finding, the medical appropriateness standard is not applicable here. Further, because the order complied with RCW 71.05.217(1)(j)(ii), the commissioner did not violate S.M.'s due process rights.

3.      Substituted Judgment

S.M. argues that the superior court commissioner's substituted judgment was inadequate because "the commissioner should have engaged in a substantive review of both the known and unknown risks [of taking antipsychotic medication] to S.M.'s health" and "should have incorporated consideration of the risks and concerns expressed by S.M. into the balancing test required under" *Ingram*. Br. of Appellant at 19-20. We hold that the superior court commissioner's substituted judgment incorporated the factors outlined in *Ingram* and is supported by substantial evidence.

During the hearing, Dr. Karnik testified about S.M.'s delusions and aggressive behavior. Dr. Karnik based his testimony on daily interactions with and observations of S.M. Dr. Karnik testified that S.M. regularly made threats to kill him, that S.M. had assaulted both fellow patients and security personnel at WSH resulting in use of restraints and seclusion, and that S.M. had thrown dangerous objects at WSH staff. Furthermore, S.M. made serious enough threats to the

White House such that both he and WSH staff were contacted and interviewed by the Secret Service.

S.M. had previously been on antipsychotic medication. Dr. Karnik testified that when S.M. had been on medication, he had not exhibited physical aggression. Dr. Karnik sought to treat S.M. with the same medication that he had been on, Zyprexa, which would help "eliminate delusions, eliminate hallucinations, eliminate paranoia." VRP at 17. S.M. had previously not experienced any side effects from Zyprexa. Even so, both Dr. Karnik and a WSH pharmacist discussed with S.M. the need for antipsychotic medication, along with possible medication side effects.

During the hearing, Dr. Karnik described at length the possible side effects of S.M.'s proposed treatment and stated that S.M. would be monitored closely and have his medication adjusted if needed. Dr. Karnik testified that he hopes to stabilize S.M. such that S.M. could be transferred to the less restrictive "civil side" of WSH. VRP at 19. Without medication, S.M.'s "physical issues and the psychosocial issues would continue to deteriorate." VRP at 22. S.M. never informed Dr. Karnik of any side effects, and S.M.'s only expressed objection to antipsychotic medication was that he did not believe he needed it.

The superior court commissioner found that the State had proven by clear, convincing, and cogent evidence S.M.'s need for antipsychotic medication. The commissioner listed out a timeline of incidents involving S.M. and his continued assaultive behavior when not taking medication. In the order's written list of instances of S.M.'s aggression, the commissioner included "threatening statements about violence to Dr. Karnik," punching a "peer in the face multiple times before [S.M.] could be restrained by staff," and "remov[ing] a large mirror from a ceiling on the ward and [throwing] it at staff." CP at 41-42. The commissioner also found that the preservation of life and

15

the protection of interests of innocent third parties are compelling State interests. *B.M.*, 7 Wn. App. 2d at 79. The commissioner cited to Dr. Karnik's testimony that when S.M. had previously been on medication, it was successful, and if S.M. resumed taking medication, he could move to a less restrictive ward with additional treatment opportunities. The commissioner noted that the only treatment alternatives available to S.M. "would be use of seclusion and restraints which are much more intrusive to [S.M.]'s liberty and, also, would likely lead to a prolonged commitment and a much longer period of commitment." VRP at 47-48.

The superior court commissioner also directly addressed S.M.'s desires regarding the medication. The commissioner noted that S.M. made no religious or moral objections to taking antipsychotic medication, nor was there any evidence of objections from family members. The commissioner cited to Dr. Karnik's testimony and stated "that the only reason [S.M. has] given for not taking the medications is he doesn't think he needs them and doesn't wish to take them." VRP at 45. The commissioner also noted that during the hearing, S.M. primarily expressed concerns over the side effects of Lithium, which was not at issue. As for S.M.'s concerns regarding Haldol, the commissioner found Dr. Karnik's explanation of how Haldol was not FDA-approved as a mood stabilizer, but was approved as an antipsychotic, more credible.

The record is clear that in making the substituted judgment, the superior court commissioner took into consideration evidence regarding S.M.'s behavior while on and off medication, the effect of the medication on S.M.'s commitment, the side effects of the medication, alternatives to medication, S.M.'s concerns regarding the medication, as well as the lack of any religious objections to the medication or evidence of objection from any family members. And in its written order, the commissioner wrote: "[S.M.] would consent to being treated with

16

antipsychotic medication if [S.M.] were capable of making a rational decision concerning treatment and this Court is hereby substituting its judgment for that of [S.M.]." CP at 44.

Thus, the record shows that the superior commissioner's substituted judgment considered the factors outlined in *Ingram* and is supported by substantial evidence. Accordingly, we hold that the commissioner did not err.

CONCLUSION

A finding of medical appropriateness is not required in a civil commitment proceeding and the superior court commissioner appropriately identified a compelling state interest, the necessity of the treatment, and considered S.M.'s desires and concerns in making its substituted judgment. Therefore, we affirm the order for involuntary administration of antipsychotic medication.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, P.J.

Che, J.

17