[No. 39954-7-II.   Division Two.   June 28, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. DAVID HOWARD MOSTELLER, *Appellant*.

---

*Nancy P. Collins* (of *Washington Appellate Project*), for appellant.

*Jonathan L. Meyer, Prosecuting Attorney,* and *Sara I. Beigh, Deputy,* for respondent.

¶1 JOHANSON, J. — David Howard Mosteller appeals his convictions for third degree assault and first degree criminal trespass. He argues that he did not receive a fair trial because the trial court ordered the administration of antipsychotic medications to restore his competency to stand trial without first balancing the State's interest in his competency to stand trial with his interest in personal autonomy. We hold that Mosteller received a fair trial and that he waived his right to challenge the trial court's order

on this appeal because he failed to object at the time of the order and did not otherwise move to terminate the order at or before trial.

## FACTS

¶2 Mosteller has a long history of mental illness and has been diagnosed with paranoid schizophrenia. In November 2008, he was harassing customers in Starbucks by going to their tables and saying obscenities. When asked to leave, Mosteller continued harassing customers at the tables outside. He then went back inside and threw his coffee into one of Starbucks' display buckets.

¶3 As Mosteller walked out the door to leave Starbucks, a police officer met him. When the officer put his hand up to motion Mosteller to wait for a minute, Mosteller began swinging at him. Mosteller hit the officer in the jaw. He was arrested and charged with third degree assault and first degree criminal trespass.

¶4 In January 2009, Mosteller was sent to Western State Hospital (WSH) for a competency evaluation. WSH found that Mosteller was incompetent to stand trial, that medication could render him competent, and that there was no less restrictive alternative.

¶5 At a pretrial hearing on February 12, the State moved to commit Mosteller to WSH for competency restoration. With Mosteller present, the following exchange took place between his counsel and the State:

[State]: Western State did send back a report dated February 9, 2009 in which it was the opinion of the doctor that did the review that Mr. Mosteller is not competent to stand trial. I've discussed this with counsel. I prepared an order of commitment to Western State for 90 days to restore competency. Included in there is a provision as suggested by the report that any medications be administered without consent if necessary.

. . . .

[Defense Counsel]: I have got the report from Western State Hospital and have reviewed it. I understand that under the

statute the prosecutor has the right to request he be sent back up there. For the record, Mr. Mosteller has been up there numerous times, has not worked that well in the past, but I think the court has enough discretion [to] go ahead and recommit [him].

Report of Proceedings (RP) (Feb. 12, 2009) at 3. Mosteller's counsel did not object, and the trial court signed the order. The order stated:

Western State Hospital shall administer such psychotrophic drugs as is deemed medically appropriate by Western State Hospital staff to assist the defendant in recovering his competency. Said medication shall be administered without the defendant's consent, if necessary.

Clerk's Papers (CP) at 44.

¶6 During this stay at WSH, Mosteller was "medication compliant and appeared to quickly benefit from treatment." Suppl. CP at 107. By April 2, WSH reported that it had restored his competency. On April 16, the trial court found Mosteller competent to stand trial. He agreed to waive his speedy trial right, and trial was set for June 1.

¶7 While awaiting trial, Mosteller stopped taking his medications. On July 15, the trial court again found him incompetent and ordered him to undergo psychiatric treatment at WSH to restore competency. The second order committing Mosteller was identical to the first order.

¶8 Upon readmission to WSH on July 29, Mosteller told his doctors that he adamantly did not want to take any antipsychotic medications. His psychiatrist prescribed Risperdal. Despite his initial refusals to take medications, Mosteller began participating in treatment, and his psychotic symptoms improved. During a mental status examination on September 23, Mosteller had organized and logical thoughts. He acknowledged that the medication reduces his stress and anger, and he planned to continue taking the medication because he did not want to return to WSH. On September 24, WSH believed competency was restored.

¶9 On October 1, the following pretrial colloquy occurred:

[State]: Case comes on for the parties requesting the court find Mr. Mosteller competent. . . .

. . . .

[Defense Counsel]: I have reviewed the letter from Western State Hospital, your Honor, finding him competent. I signed off on that order.

THE COURT: I signed it as well.

RP (Oct. 1, 2009) at 6. The trial court's written order declared Mosteller competent to stand trial.

¶10 Mosteller waived his right to trial by jury and trial began on October 29. The trial court found him guilty of third degree assault and first degree criminal trespass. The court sentenced Mosteller to 33 months of confinement and 27 months of community custody. As a condition of community custody, the court ordered Mosteller to undergo mental health treatment, complete all recommended treatment, and take prescribed medication.

## ANALYSIS

### Involuntary Medication To Restore Competency

¶11 Mosteller argues that the trial court violated his constitutional right to due process when it ordered that antipsychotic medications be administered, involuntarily if necessary, to restore his competency, without first considering the requirements set out in *Sell v. United States*, 539 U.S. 166, 180-81, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003). This argument fails.

■■ ¶12 Forcibly medicating an individual against his will "represents a substantial interference with that person's liberty." *Washington v. Harper*, 494 U.S. 210, 229, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990). In rare circumstances, the State can forcibly administer unwanted medications solely for trial competency purposes. *Sell*, 539 U.S. at 180.

To order the administration of medications in such situations, however, the trial court must consider certain factors, which are known as the *Sell* factors.[1] *Sell*, 539 U.S. at 180-81.

## A. Failure To Preserve Issue for Appeal

¶13 The State argues that Mosteller has not preserved this issue for appeal because he failed to raise it at the trial court. Mosteller counters that despite his failure to raise the issue, the error is reviewable for the first time as a "manifest error affecting a constitutional right." RAP 2.5(a)(3).

¶14 Generally, an issue cannot be raised for the first time on appeal unless it is a "manifest error affecting a constitutional right." RAP 2.5(a)(3); *State v. McFarland*, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995). But " 'the constitutional error exception is not intended to afford criminal defendants a means for obtaining new trials whenever they can identify a constitutional issue not litigated below.' " *State v. Kirkpatrick*, 160 Wn.2d 873, 879, 161 P.3d 990 (2007) (internal quotation marks omitted) (quoting *State v. Scott*, 110 Wn.2d 682, 687, 757 P.2d 492 (1988)). "We adopt a strict approach because trial counsel's failure to object to the error robs the court of the opportunity to correct the error and avoid a retrial." *State v. Powell*, 166 Wn.2d 73, 82, 206 P.3d 321 (2009).

¶15 We employ a two-part analysis to determine whether an error is a "manifest error affecting a constitutional right" under RAP 2.5(a)(3). *Kirkpatrick*, 160 Wn.2d at 879. First, we determine whether the alleged error is truly

---

[1] Under *Sell*, the trial court must first find that important state interests are at stake. *Sell*, 539 U.S. at 180. Second, the court must conclude that involuntarily administering medication will significantly further the state's interest in rendering the defendant competent to stand trial. *Sell*, 539 U.S. at 181. Third, the court must conclude that involuntarily administering medication is necessary to further the state's interest to render the defendant competent to stand trial. *Sell*, 539 U.S. at 181. Fourth, the court must determine that administering the drugs is in the individual's best medical interest, given his medical condition. *Sell*, 539 U.S. at 181.

constitutional. *Kirkpatrick*, 160 Wn.2d at 880. Second, we determine whether the alleged error is "manifest." *Kirkpatrick*, 160 Wn.2d at 880. Mosteller alleges that the trial court violated his right to a fair trial and his liberty interest in being free from forced medication. These rights are constitutional in nature. *Harper*, 494 U.S. at 229; *Riggins v. Nevada*, 504 U.S. 127, 137-38, 112 S. Ct. 1810, 118 L. Ed. 2d 479 (1992).

■■ ¶16 The more difficult question is whether the alleged errors are "manifest." " ' "Manifest" in RAP 2.5(a)(3) requires a showing of actual prejudice.' " *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009) (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)). "To demonstrate actual prejudice, there must be a 'plausible showing by the [appellant] that the asserted error had practical and identifiable consequence in the trial of the case.' " *O'Hara*, 167 Wn.2d at 99 (alteration in original) (internal quotation marks omitted) (quoting *Kirkman*, 159 Wn.2d at 935). "In determining whether the error was identifiable, the trial record must be sufficient to determine the merits of the claim." *O'Hara*, 167 Wn.2d at 99. " 'If the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest.' " *O'Hara*, 167 Wn.2d at 99 (quoting *Kirkman*, 159 Wn.2d at 935). We must decide whether Mosteller can show practical and identifiable adverse consequences at trial as a result of the trial court's order for involuntary administration of medication to render him competent.

## B. *Riggins*—No Prejudice

¶17 Mosteller argues that regardless of his failure to object, the record shows that the trial court's order had practical and identifiable consequences for his trial because the side effects of taking antipsychotic medications caused an unknown degree of harm, both to him physically and to his right to a fair trial. To support this contention, he relies on *Riggins*, 504 U.S. 127.

¶18 Riggins was taken into custody for murder, and he told a psychiatrist that he was hearing voices in his head and was having trouble sleeping. *Riggins*, 504 U.S. at 129. The psychiatrist prescribed Mellaril, an antipsychotic drug, and Dilantin, an antiepileptic drug. *Riggins*, 504 U.S. at 129. Riggins's Mellaril dosage was gradually increased to 800 milligrams per day. *Riggins*, 504 U.S. at 129.

¶19 Riggins moved to suspend administration of these medications until the end of trial. *Riggins*, 504 U.S. at 130. He argued that the medications' effect on his demeanor and mental state during trial would deny him due process. *Riggins*, 504 U.S. at 130. He also argued that because he would offer an insanity defense at trial, he had a right to show jurors his true mental state. *Riggins*, 504 U.S. at 130.

¶20 At the hearing on Riggins's motion, one doctor suggested that Riggins's dosage was within the toxic range and could make him " 'uptight.' " *Riggins*, 504 U.S. at 137. Another doctor testified that a patient taking 800 milligrams of Mellaril each day might suffer from drowsiness or confusion. *Riggins*, 504 U.S. at 130-31, 137. The trial court denied Riggins's motion in a one-page order that did not provide its rationale. *Riggins*, 504 U.S. at 131. Riggins continued to receive 800 milligrams of Mellaril each day through his trial. *Riggins*, 504 U.S. at 131.

¶21 The United States Supreme Court held that the trial court erred, reasoning that by permitting Riggins to be forcibly medicated without accounting for his liberty interest, the trial court created the possibility of trial prejudice stemming from the side effects of being medicated. *Riggins*, 504 U.S. at 137-38. Those side effects could impact not only "Riggins' outward appearance, but also the content of his testimony on direct or cross[-]examination, his ability to follow the proceedings, or the substance of his communication with counsel." *Riggins*, 504 U.S. at 137.

¶22 *Riggins* is distinguishable because Mosteller failed to move to terminate the administration of antipsychotic medication, a prerequisite to the State's obligation to establish the need for administering the drug to

restore competence and the medical propriety for the drugs prescribed. *See Riggins*, 504 U.S. at 135 ("[O]nce Riggins moved to terminate administration of antipsychotic medication, the State became obligated to establish the need for [the antipsychotic drug] and the medical appropriateness of the drug."). Moving to terminate administration of antipsychotic medication creates a record that the defendant did not wish to take medications under compulsion.

¶23 Here, largely due to Mosteller's failure to object, the record does not demonstrate that Mosteller was actually forced to take antipsychotic medications during trial. The mental evaluation report from his first stay at WSH states that Mosteller was "medication compliant." Suppl. CP at 107. The report from his second stay at WSH states that although Mosteller initially refused to take medications, he eventually began participating in treatment. We cannot interpret this as evidence that Mosteller was forced to take antipsychotics at WSH, let alone during trial. Because the record here is silent on the critical fact of whether Mosteller was *forced* to take antipsychotic medications, we cannot determine whether such medications caused him to suffer any practical and identifiable consequences at trial.[2] *See, e.g., In re Det. of Morgan*, 161 Wn. App. 66, 84, 253 P.3d 394 (2011) (record did not demonstrate that defendant was forcibly medicated during trial and evidence outside record will not be considered).

¶24 Even assuming Mosteller was forcibly administered medications, we are unable to determine how the medications may have prejudiced him at trial. Mosteller's failure to object to the trial court's order left the record devoid of any evidence that the medications negatively affected his right to a fair trial. Contrary to Mosteller's assertions that the antipsychotics negatively affected him, the record shows that Mosteller benefitted from the pre-

---

[2] Also unlike Riggins, Mosteller did not assert an insanity defense. Therefore, whether the antipsychotic medications would impinge Mosteller's right to show jurors his true mental state is not at issue.

scribed medication and treatment by restoring his competency to stand trial.

¶25 When Mosteller arrived at WSH under the trial court's first order to restore his competency, he was "disorganized, confused, possibly confabulating, and his responses at times were nonsensical." Suppl. CP at 81. After taking the prescribed medication and undergoing treatment, "[Mosteller's] [c]onfusion which was so prominent on admit has resolved to a large extent." Suppl. CP at 82. Likewise, when Mosteller arrived at WSH for the second competency restoration, he was "disheveled, malodorous, and poorly groomed. . . . His thought process appeared a bit disorganized and some paranoid and delusional thought content was noticeable." Suppl. CP at 82. But after treatment, "Mosteller was noted to interact appropriately with peers and staff and actively participate in his treatment. . . . Mosteller was clear in his thinking and speech, denied any psychotic symptoms, and no psychotic symptoms were observed." Suppl. CP at 82.

¶26 Unlike *Riggins*, in which the type and quantity of medication that Riggins was taking could have had significant adverse and identifiable side effects, the medication here appeared to significantly help Mosteller, and there is nothing in the record showing any negative side effects. Thus, we hold that Mosteller has not shown that the trial court's order directing the administration of antipsychotic medication had any practical and identifiable adverse consequences at trial.

### C. *Sell* Factors—No Structural Error

¶27 Finally, Mosteller argues that the trial court's failure to engage in a *Sell* factor analysis before ordering that he involuntarily take medication to restore his competency to stand trial constituted structural error. " '[M]ost constitutional errors can be harmless.' " *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 306, 111 S.

Ct. 1246, 113 L. Ed. 2d 302 (1991)). Only in a very limited number of cases are errors "structural" and, thus, subject to automatic reversal. *Neder*, 527 U.S. at 8. Constitutional violations that defy harmless-error review "contain a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.' " *Neder*, 527 U.S. at 8 (quoting *Fulminante*, 499 U.S. at 310). "An error is structural when it 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' " *State v. Momah*, 167 Wn.2d 140, 149, 217 P.3d 321 (2009) (alteration in original) (internal quotation marks omitted) (quoting *Washington v. Recuenco*, 548 U.S. 212, 218-19, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006)), *cert. denied*, 131 S. Ct. 160 (2010).

¶28  We cannot say that a structural error occurred when the trial court, without first considering the *Sell* factors, ordered administration of antipsychotic medications for the purpose of restoring Mosteller's competency. Again, we do not know if Mosteller was forcibly administered antipsychotics at trial. The record reflects that initially, he adamantly did not want to take medications while at WSH but that he later started participating in treatment. And although antipsychotic medications may in some instances adversely affect a defendant's ability to follow trial proceedings, communicate with counsel, and participate in his own defense, this record does not support Mosteller's claim that his criminal trial was fundamentally unfair or an unreliable vehicle for determining his guilt or innocence. On the contrary, the evidence before us suggests that the medications helped resolve Mosteller's psychosis by reducing his confusion and improving his speech, which would have helped him prepare for trial, follow proceedings, communicate with counsel, and participate in his defense; these effects would have tended to render his trial more fair rather than unfair. We cannot conclude that he suffered prejudice as a matter of law.

¶29  In summary, we hold that Mosteller received a fundamentally fair trial and that due to his failure to object

at trial, Mosteller waived his challenge to the court-ordered administration of antipsychotic medications to restore his competency.

¶30 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

PENOYAR, C.J., and HUNT, J., concur.

Review denied at 172 Wn.2d 1025 (2011).