# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of: | No. 58076-4-II |
| K.B., | UNPUBLISHED OPINION |
| Appellant. | |

CHE, J. — KB appeals the trial court order committing her for 180 days of involuntary treatment after a jury found by clear, cogent, and convincing evidence that she has a behavioral health disorder, is gravely disabled as a result of the behavioral health disorder, and her best interests will not be served a by less restrictive alternative to detention. She argues that the trial court violated her procedural due process rights by not requiring the jury to agree on the basis for finding her gravely disabled and that the jury's finding that a less restrictive alternative was not in her best interests was not supported by the evidence. We disagree and affirm.

## FACTS

KB, a 75-year old woman who was diagnosed with schizophrenia in her mid-50s, was first committed to Western State Hospital in 2004. She was discharged and recommitted three times before her current commitment began in December of 2012 following a jury finding of grave disability. KB has been recommitted every 180 days since. KB was appointed a legal guardian to be her decision-maker and to help take care of KB's money and housing issues if needed when discharged from WSH.

In November 2022, the State petitioned to recommit KB for another 180 days based on her being gravely disabled and contended that KB was ready for a less restrictive alternative placement. The case proceeded to a jury trial during which three members of KB's care team at Western State and KB testified. At trial, the State argued that KB was gravely disabled as a result of her behavioral health disorder and that a less restrictive alternative placement was no longer in KB's best interests due to a deterioration in her condition since the petition was filed.

Dr. Elwyn Hulse, KB's treating psychologist for the past two years, testified that KB has no understanding of how she came to be at WSH and believes she arrived through a time portal from Anchorage, Alaska. Dr. Hulse also diagnosed KB with schizophrenia and major neurocognitive disorder, also known as dementia. He testified that if released from WSH, KB would not seek out or follow up with mental health care and would "psychiatrically implode," adding that "she would be in such a weakened and vulnerable state that a predator would take easy advantage of her." 2 Rep. of Proc. (RP) at 249.

Dr. Hulse did not believe that without substantial support KB would be capable of securing housing, would not take care of her nutrition and hydration, and would likely ignore her other nonpsychotropic medical needs. Dr. Hulse acknowledged that KB's appointed legal guardian could help her obtain housing, make sure her bills are paid, and help her get the care she needs in the community. Lastly, Dr. Hulse believed that if KB was released into the community, she would not seek out any of her psychiatric medication because she does not believe she is mentally ill.

Jennifer Drake, the psychiatric nurse practitioner primarily responsible for KB's care since March of 2022, testified that she sees KB regularly on the ward and meets with her individually at least once a month. Drake testified that KB's schizophrenia presents primarily as delusional thoughts including a fear of being poisoned through her food, water, and medications, that a nonexistent WSH psychiatrist had ordered her discharge, that she had a family home to return to in Seattle, and she was once a psychiatrist on the staff at WSH. Drake explained that KB denies that she has schizophrenia or any other mental health disorder and has little insight into her condition.

According to Drake, KB's major neurocognitive disorder impacts her executive functioning skills, impairs her judgment, and limits her ability to make decisions. Drake testified that KB often neglects participating in personal hygiene, will not get out of bed, or refuses to get up for meals or water. Drake testified that KB is prescribed two medications to manage her schizophrenia and neurocognitive disorder but is frequently not compliant. One medication is taken monthly by injection and one is taken daily either by pill or injection. Due to KB's belief that the pill version of the one medication is poisoned, she preferred to receive the medication through a daily injection. At the time of the trial, KB had refused her daily prescription for approximately two months.

Prior to that, KB had been approximately 75-80 percent compliant with her medication and was doing well. Drake provided an example of KB's recent deterioration. In the weeks before trial, KB insisted that she had been discharged from WSH but the staff had lost her discharge papers because they were too high on ecstasy. KB demanded the staff let her leave the

3

hospital or find her discharge papers and that if not, the Army, who had just vaporized aliens, would break into the hospital to free her.

Drake testified that she believed KB could not care for her health and safety needs if released from WSH, noting that even with the high level of assistance provided by hospital staff, Drake struggles to care for herself. Drake testified that she believes KB is gravely disabled, would show severe deterioration in routine functioning if left without care and supervision, and would not seek out medical care for herself. As to a less restrictive alternative placement, Drake testified that she did not believe that was in KB's best interests at the time because the adult family home she was originally planning to move to was no longer able to administer KB's daily medication in an injectable format.

Emily Ayuko-Schiemenz, a discharge social worker at WSH, testified that KB was removed from the discharge list because she stopped being medication compliant. Ayuko-Schiemenz testified that KB did not have a home, any family, or friends to whom she could be discharged.

KB testified on her own behalf. She would like to be released and move to her home in Seattle with her husband. Notably, all of the evidence except for KB's own testimony showed that KB did not have a husband, a home in Seattle, or any other family or friends to whom she could be discharged. Her testimony appears consistent with reports of her delusional thoughts. KB did not believe she is gravely disabled and would like to stop taking her medication.

While KB and the State proposed different jury instructions for the definition of gravely disabled, at no point did KB request an instruction that required the jury to make a unanimous

special verdict finding under prong (a) or a unanimous special verdict finding under prong (b) for grave disability. The jury found that KB has a behavioral health disorder resulting in her being gravely disabled. The jury also found that the State had proven that the best interests of KB would not be served by a less restrictive alternative treatment placement to detention. The jurors were polled and all 12 responded that the verdict was their verdict. Pursuant to those findings, the trial court entered an order committing KB for up to an additional 180 days of treatment at WSH.

ANALYSIS

I. PROCEDURAL DUE PROCESS

KB argues that the trial court violated her due process rights by not requiring the jury to agree on the basis for its finding of grave disability. We decline to address this issue because KB did not preserve the issue for appeal and KB fails to show a manifest constitutional error under RAP 2.5(a)(3).

There are two ways the State may prove that a person is "gravely disabled." Clerk's Papers at 202. Under former RCW 71.05.020(17) (2011), a gravely disabled person is one who:

> as a result of a mental disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

At trial, the jury was instructed on both prongs of the definition of grave disability and was not given any instruction requiring the jury to unanimously agree on the same prong under grave disability. KB did not propose an instruction that required the jury to make a unanimous

5

special verdict finding under prong (a) or a unanimous special verdict finding under prong (b) for grave disability. KB argues that procedural due process requires that at least 10 jurors agree on the same prong under which KB is gravely disabled. To support her argument she relies on the procedural due process principles established in criminal law addressing "multiple acts" cases. But no Washington court has held that this principle extends to involuntary commitment cases.[1]

Generally, an appellate court will not consider issues raised for the first time on appeal unless there is a "manifest error affecting a constitutional right." RAP 2.5(a)(3); *In re Det. of B.M.*, 7 Wn. App. 2d 70, 88-89, 432 P.3d 459 (2019). "The appellant must demonstrate the error is manifest and 'truly of constitutional dimension,'" meaning "there must be a showing of actual prejudice." *B.M.,* 7 Wn. App. 2d at 89 (quoting *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009)). To demonstrate actual prejudice, a party must show that the asserted error had practical and identifiable consequences during the trial. *State v. Mosteller*, 162 Wn. App. 418, 426, 254 P.3d 201 (2011). "In determining whether the error was identifiable, the trial record must be sufficient to determine the merits of the claim." *O'Hara*, 167 Wn.2d at 99.

KB cannot show manifest constitutional error under RAP 2.5(a)(3). "Procedural due process prohibits the State from depriving an individual of protected liberty interests without

---

[1] This court addressed this argument in *In re Det. of A.N.*, 27 Wn. App. 2d 1001 (2023), an unpublished opinion. There, this court exercised its discretion to address the merits of A.N.'s argument despite the fact that he did not object to the jury instructions as given or propose an instruction requiring jurors agree on one basis for a finding of grave disability. This court did not affirmatively hold that the criminal law principle of alternative means cases applies in an involuntary commitment case, but held that even if it did, A.N.'s argument would fail because substantial evidence supported a finding of grave disability under both prongs.

appropriate procedural safeguards." *State v. Lyons*, 199 Wn. App. 235, 240, 399 P.3d 557 (2017). It is well established that due process guarantees in commitment proceedings are satisfied when 10 out of 12 jurors agree upon a verdict. RCW 4.44.380; *In re Det. of McLaughlin*, 100 Wn.2d 832, 845, 676 P.2d 444 (1984). Here, all 12 jurors agreed that KB was gravely disabled.[2] The record does not sufficiently establish that the jury reached their verdict with some jurors finding grave disability under prong (a) and others finding grave disability under prong (b); it would be mere speculation to come to that conclusion. Moreover, no Washington court has extended the procedural due process principle from criminal cases to this context to require more than just a finding of grave disability, and we decline to do so for the first time now. Because KB did not preserve the issue and cannot show any manifest error effecting a constitutional right, we decline to address her argument raised for the first time on appeal.

## II. LESS RESTRICTIVE ALTERNATIVE PLACEMENT

KB also argues that even if the jury's gravely disabled verdict is valid, the jury erred by finding that a less restrictive alternative placement to confinement was not in her best interests. We disagree.

If the trial court finds that an individual may be committed, it must also determine whether a less restrictive alternative treatment is in "the best interests of the person or others." RCW 71.05.320(1); *In re Det. of T.A.H.-L.*, 123 Wn. App. 172, 184, 97 P.3d 767 (2004). The

---

[2] KB does not challenge that there is sufficient evidence to support the jury's finding of grave disability.

State bears the burden of proving that a less restrictive alternative is not in the individual's best interests. *T.A.H.-L.*, 123 Wn. App. at 186. We will not disturb the trial court's findings if they are supported by substantial evidence which the trial court could reasonably have found to be clear, cogent, and convincing. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019). When evaluating whether the evidence was sufficient, we view the evidence in the light most favorable to the petitioner. *A.M.*, 17 Wn. App. 2d at 330.

Here, the jury's finding that a less restrictive alternative was not in KB's best interests was supported by substantial evidence. In the time between the petition being filed and the jury trial, KB had become medication noncompliant resulting in significant decompensation despite the high level of care provided to her by WSH along with the fact that the adult family home to which KB could be released was no longer an option. The record at trial was replete with evidence that KB would be highly unlikely to maintain treatment necessary to support her mental and physical health if discharged from WSH. KB relies on the fact that she has a legal guardian to support her upon release to a less restrictive alternative. But the jury heard testimony about the role KB's legal guardian could play upon KB's release. We will not reweigh the evidence on appeal; rather, we defer to the jury's findings so long as they are supported by substantial evidence. *B.M.*, 7 Wn. App. 2d at 85. This evidence was sufficient to persuade the jury that a less restrictive alternative was not in KB's best interests.

No. 58076-4-II

CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____

Che. J.

We concur:

_____

Cruser, C.J.

_____

Veljacic, J.