# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of: | No. 58760-2-II |
| S.P., | |
| Appellant. | UNPUBLISHED OPINION |

LEE, J. — S.P. appeals the trial court's order committing him to 90 days of involuntary treatment. S.P. argues that there is insufficient evidence to support the jury's finding that he is gravely disabled. S.P. also argues that his due process rights were violated because the trial court did not require the jurors to agree on the basis of its grave disability finding.[1]

Because S.P. displays severe deterioration from safe behavior, loss of cognitive and volitional control, and an inability to provide for his own essential needs, we hold sufficient evidence supported the jury's finding that S.P. is gravely disabled. Further, because S.P. failed to raise a due process argument at the proceedings below and he cannot show there was a manifest error affecting a constitutional right, we decline to address S.P.'s due process argument. Accordingly, we affirm the superior court's commitment order.

---

[1] S.P. references a 12-member jury, and argues 10 out of 12 jurors needed to agree in order to have a valid verdict throughout his brief. S.P.'s jury trial, however, consisted of a 6-member jury, which only requires 5 out of the 6 jurors to agree on a verdict. RCW 4.44.380. Accordingly, we interpret S.P.'s argument to be that due process requires the jurors who found him gravely disabled to agree on the basis for the gravely disabled finding, and not an argument that a jury of fewer than 12 violates due process in an involuntary commitment trial.

FACTS

A. BACKGROUND

In February 2023, S.P. was arrested and charged with third degree malicious mischief. Based on behaviors S.P. was exhibiting, S.P. was referred for a mental health evaluation.

In March 2023, a designated crisis responder (DCR) evaluated S.P. and found that S.P. presented as "gravely disabled and in danger of serious harm resulting from a failure to meet [his] health and safety needs," as evidenced by S.P.'s disorientation, delusions, and inability to distinguish between delusions and reality. Clerk's Papers (CP) at 4 (underlining omitted). The DCR also noted that S.P. had previous admissions to Western State Hospital in 2008 and 2018, along with "a history of incarceration, history of violence towards others to include charging at family with a knife, history of psychiatric hospitalization dating back to at least 2008, and history of nonadherence to psychiatric medications." CP at 3 (underlining omitted). S.P. was diagnosed in 2009 with schizotypal personality disorder and paranoid schizophrenia. The DCR filed an emergency detention petition.

Once the DCR determined that S.P. met the criteria for involuntary detention, S.P. was taken to a hospital where he was medically cleared. S.P. was then admitted to Telecare Thurston Mason Evaluation and Treatment Center (Telecare) on March 11, with a probable cause hearing set for March 16. While at Telecare, S.P. experienced numerous delusions, responded to internal stimuli, was disorganized, had loose associations, spoke with pressured speech, and was unable to reason a decision.

At the March 16 probable cause hearing, the superior court found S.P. gravely disabled as a result of a behavioral health disorder and in danger of serious physical harm resulting from failure to provide for his essential needs. S.P. was committed to 14 days of involuntary treatment.

B.      90-DAY PETITION

In late March 2023, Justina Harris-McCray, a mental health professional, and Brenda Alexander-O'Neil, a psychiatric nurse practitioner, filed a 90-day involuntary treatment petition. In April 2023, two new petitioners filed a 90-day involuntary treatment petition. The petition was substantively the same as the March 90-day petition; the only difference was a substitution of petitioner-providers, now Kyle Schaeffer, a mental health professional, and Stephanie Brooks, a psychiatric nurse practitioner.

According to the petition, S.P. needed further treatment because he continued to be gravely disabled due to a "failure to provide for [his] essential human needs" and because S.P. displayed "severe deterioration in routine functioning." CP at 32, 34 (boldface omitted). Since his admission to Telecare, S.P. presented as "disheveled, disorganized, delusional, tangential and irritable" shown through different interactions such as "yell[ing] at the provider," "responding to internal stimuli," and "making nonsensical statements about the country not following God's will." CP at 33. S.P. also expressed intentions to involve the FBI because he was "losing muscle, being starved and [because] drugs [were] being forced upon him." CP at 33. S.P. then lost his phone privileges after calling 911 multiple times to report his delusions. S.P. later requested that a provider from Telecare call the FBI for him and express to the FBI that S.P. was "'being poisoned and starved.'" CP at 34. The petition further explained:

3

> [S.P.] has a mental disorder that has substantial adverse effects upon [S.P.]'s cognitive or volitional functions in the following ways: [S.P.] has a history of impatient hospitalizations. . . history of involuntary detentions. . . [and] history of illegal behavior. . . . [S.P.] often believes that psychiatric medication is going to kill him. He has a history of disorganization, confusion, tangential and loose associations, hyperverbal and pressured speech, grandiose and persecutory delusions, and can be observed responding to internal stimuli.

CP at 76 (underlining omitted).

S.P. also told providers at Telecare that he had written a book, worked for a healthcare company, that he owned his own banking system, and that he owned "'seven deeds of land.'" CP at 79. S.P. also made statements to providers such as, "[T]he provider was being sentenced to the 'death penalty and 38,000 of . . . incurable diseases,'" and "'I'm not taking pills! You're giving me pills instead of food. That's a violation of my civil liberties. The judge told me I was free to go.'" CP at 80. On another occasion, S.P. "pushed the door shut on the RN and would not allow her into the room with the computer . . . . He allowed the RN to enter about 2 minutes later." CP at 32. S.P. then slammed the laptop computer shut and attempted to throw it in response to suggestions to take medication. Additionally, S.P. did not sleep, isolated himself, only came out of his room for meals, and "had not showered for four days." CP at 82.

C. JURY TRIAL

S.P. requested a jury trial. The trial court empaneled a six-member jury. Schaeffer, Brooks, and S.P. testified.

1. Schaeffer's Testimony

Schaeffer testified that he is a clinician at Telecare. Schaeffer noted that he first met S.P. on March 11, 2023, when S.P. was admitted to Telecare. Schaeffer testified that he diagnosed S.P. with schizophrenia based on S.P.'s presentation of several symptoms, including delusions,

hallucinations, disorganized thought, and "poverty of speech," meaning S.P. "struggle[d] to come up with words and speak his mind clearly." Verbatim Rep. of Proc. (VRP) (Apr. 11, 2023) at 101.

S.P. also expressed delusional thoughts to Schaeffer, including owning "seven deeds of land" and having $13,000 in a backpack that the Woodland Police Station has in its possession. VRP (Apr. 11, 2023) at 127. Schaeffer testified that S.P. had "tried to collect rent from somebody living on one of these pieces of land and the person threatened to kill him." VRP (Apr. 11, 2023) at 127. S.P. continuously explained to Schaeffer that he did not have schizophrenia. S.P. additionally shared that he does not want to live in an adult home.

S.P. on several occasions was unwilling to take his medication, believing that the medication is going to kill him. Schaeffer stated that often when an individual is "preoccupied with delusional thought content, they may not pursue something as simple as adequate nutritional intake . . . [or] understand when they need medical attention." VRP (Apr. 11, 2023) at 122-23.

Schaeffer expressed concern that if released, S.P. would be unhoused, unwilling to take medication, and unwilling to seek help. Schaeffer testified that "homelessness would be an almost inevitable road back to detention or potentially something even worse than civil commitment." VRP (Apr. 11, 2023) at 170.

2. Brooks' Testimony

Brooks testified that she is a psychiatric nurse practitioner at Telecare. Brooks explained her role as providing one-on-one psychiatric evaluations with patients at the facility while also managing the patients' "medication, provide some psychotherapy, and also education with regards to their medications." VRP (Apr. 11, 2023) at 177. S.P. became Brooks' patient about a week prior to the jury trial.

Most of Brooks' testimony was consistent with Schaeffer's testimony. Brooks specifically testified to S.P. isolating himself from others and observed him "just nonstop having conversations on his own." VRP (Apr. 11, 2023) at 190. S.P. also shared with Brooks "his belief that he has a tumor in his brain" even though S.P. had been medically cleared. VRP (Apr. 11, 2023) at 184.

Brooks testified about S.P.'s history of weight loss; specifically, during one of S.P.'s previous detentions, S.P. was noted to be malnourished "due to the negative symptoms[2] and also his delusions." VRP (Apr. 11, 2023) at 196. For instance, during that detention, S.P. lost 10 pounds in 30 days. Brooks noted concern regarding this weight loss because it meant that S.P. was "withholding food and not having enough food intake, where [S.P.'s] daily caloric intake [was] very insufficient." VRP (Apr. 12, 2023) at 290. Brooks further stated that the weight loss indicated that S.P. was "not getting the proper nutrients, the proper diet [S.P. was] supposed to have," despite being provided food. VRP (Apr. 12, 2023) at 290.

Brooks emphasized the importance of S.P. taking his medication, and S.P.'s need for medication, because schizophrenia is treated through medication. Brooks stated that antipsychotics are used to treat schizophrenia and that antipsychotics target "your dopamine receptors . . . [which] are the ones that involved . . . paranoia, delusions and hallucinations." VRP (Apr. 11, 2023) at 201. Brooks explained that "a person can easily decompensate when . . . they stop their medication. The non-compliance of their medication. Their social and environmental factors can also play into effect with regards [sic] to decompensation." VRP (Apr. 11, 2023) at

---

[2] Negative symptoms for individuals with schizophrenia "involve[] the symptoms that are lacking . . . like . . . the lack of motivation, the lack of interest, the lack of—or unable to start activities." VRP (Apr. 11, 2023) at 194.

221. Brooks expressed concern that if S.P. is released, S.P. will not take his needed medication and is therefore at risk of decompensating, and Brooks believed that with more time, S.P. will begin to see improvement. Brooks also believed that in order for S.P. to be released, S.P. needs "to gain insight with regards to his mental health . . . recognize the importance of him tak[ing] his medication . . . recognize the importance of following through his outpatient services. . . [and] the need for him to have a safe housing." VRP (Apr. 11, 2023) at 237.

3. S.P.'s Testimony

S.P. testified and expressed his desire to leave Telecare. S.P. stated that upon release, he would rent an apartment in Woodland and that he has income sources such as owning "seven deeds" in Woodland, as well as other government provided income. VRP (Apr. 12, 2023) at 319. With regard to the seven deeds, S.P. explained:

> I have discussed it with the police officers that arrested me, because I didn't want it to be stolen. I have them from a legal action that took place in Clark county, I was awarded seven deeds, because the dollar value that I sued for was so much, they awarded it to me. I didn't really want to own land because then you have to have a business license and pay taxes. And taxes, you have to—in this State, section 6 is gold and silver coins and gold bars, which the gold and silver coins are rare because they're government manufactured and they're sold as collector coin. You're supposed to be able to buy them at face value, dollar for dollar, paper dollar for dollar of it, but you can't because—

VRP (Apr. 12, 2023) at 319-20. S.P. also testified that he does not have schizophrenia and that he does not need to take any kind of medication. S.P.'s only concern about his health was with his physical wellbeing, stating:

> Two days ago, I weighed 161 pounds. When I was arrested I weighed 140. When I left the jail a month later—I was arrested on the 16th, on the 10th I left—I weighed 136. And now I've lost a [sic] inch and a half diameter in my thighs and ''ve gained fat on my belly.

7

And I discovered copper pipes at the Telecare center, which is illegal. Water pipes are not supposed to be copper. When I was young, I wanted to become a plumber so I went to the Plumber's Union Hall——

. . . .

. . . But my physical health, I'm really unstable. I have to pee every 15 to 22 minutes, 24 hours a day. And I got shakes, unstable—what do they call it? You know, the leg shooters.

VRP (Apr. 12, 2023) at 328, 344. S.P. was also concerned with his health in reference to his transportation to the court for the jury trial, expressing that he did not want to get into the ambulance and when he did, he "got polluted with the diesel with [sic] from the ambulance, [and] now [he has] hand vibrations." VRP (Apr. 12, 2023) at 344. S.P. also expressed concerns with the medication. When asked if he would take the prescribed medication, S.P. responded:

No, because its side effects are too horrendous. I would rather take CBD2 marijuana, which is in—in a *Times Magazine*. *Times Magazine* is a very wide distributed magazine. And you can eat marijuana and get high or eat marijuana and not get high. So, if I'm working and I don't want to be high it won't affect me, I can do that and use it to heal and repair because that's what it does.

VRP (Apr. 12, 2023) at 342. S.P. told the court that, if released, he will not attend medical appointments, will not take prescribed medication, and does not believe he needs to be in an adult home.

During cross-examination, the State inquired about S.P.'s father:

Q.      . . . I have heard information that your father is dead. Is that not accurate?

A.      No. Because the winter of 2021, I seen him and my sister in the car together. And they went to the bank that I was going to, and my dad went in the bank—and a big stack of hundreds, like this. Big fat stack, fanned it out like this, and waved it like that, and put it away. He was in front of the line.

Q.      . . . But isn't it true that your father had been, prior to that, declared dead?

8

A.     Yes. I have the memorial document from the funeral with his, you know, the little history about him, who his survivors are and whatnot, in my backpack at the Woodland Police Station.

Q.     So, you are saying that since your father was legally declared dead that you have seen him in the bank like you have talked about?

A.     Yes. But I have not seen there is an actual death certificate, you know. I don't know why he did this. I have no idea.

VRP (Apr. 12, 2023) at 326-27.

4.     Jury Instructions and Special Verdict Form

Following testimony, the trial court instructed the jury that "the petitioners must prove by clear, cogent and convincing evidence that [S.P.] has a behavioral health disorder and that he is gravely disabled as a result of a behavioral health disorder." VRP (Apr. 12, 2023) at 353. The trial court also instructed the jury on the definition of gravely disabled:

> Gravely disabled means a condition in which a person, as a result of a behavioral health disorder:
> (a) is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety, or
> (b) manifests severe deterioration in routine functioning evidenced by:
>> 1) repeated and escalating loss of cognitive or volitional control over his or her actions; and
>> 2) is not receiving or would not receive, if released, such care as is essential for his or her health or safety.
>
> Under prong (a), above, of the "gravely disabled" persons standard, the petitioners must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded. The failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors.
>
> Involuntary commitment may be justified under prong (b)(1), above, of "gravely disabled" if a person's mental functioning has stabilized or improved as a result of the initial commitment, but the person would not receive such care as is

essential for his health or safety if released (i.e., his or her condition would severely deteriorate due to a lack of adequate care, if released).

Involuntarily commitment, under prong (b)(2) of "gravely disabled" is also justified if the individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment.

CP at 149-50.

The jury was given a special verdict form which asked the jury whether S.P. was gravely disabled. The special verdict form did not request the jurors to distinguish under which prong of grave disability they were making their finding. The instruction to the jury about the special verdict form included the following: "In order to answer any question on the verdict form, five jurors must agree upon the answer." CP at 153.

5.      Jury Verdict and Court Order

Following trial, the jury found S.P. gravely disabled as a result of his behavioral health disorder. When polled, five out of the six jurors confirmed the jury verdict was their verdict, and all confirmed it was the verdict of the jury. Based on the jury's verdict, the superior court entered an order committing S.P. to 90 days of involuntary treatment.

S.P. appeals.[3]

ANALYSIS

A.      SUFFICIENCY OF THE EVIDENCE

S.P. argues that the State did not present sufficient evidence to prove that S.P. was gravely disabled. We disagree.

---

[3] The involuntary commitment order at issue has expired. Although the order has expired, this appeal is not moot because involuntary commitment orders have collateral consequences for future commitment determinations. *In re Det. of M.K.*, 168 Wn. App. 621, 625-27, 279 P.3d 897 (2012).

1. Legal Principles

The burden is on the petitioner to provide "clear, cogent, and convincing evidence" to support petitions for involuntary treatment. RCW 71.05.310; *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). When the standard is clear, cogent, and convincing evidence, "the ultimate fact in issue must be shown by evidence to be 'highly probable.'" *LaBelle*, 107 Wn.2d at 209 (internal quotation marks omitted) (quoting *Pawling v. Goodwin*, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)).

Under the Washington Involuntary Treatment Act (ITA), chapter 71.05 RCW, an individual may be subject to involuntary treatment if they are found to be gravely disabled as a result of a behavioral health disorder. *Id.* at 201-02. A behavioral health disorder includes a mental disorder or a substance use disorder. RCW 71.05.020(8). A mental disorder is defined as "any organic, mental, or emotional impairment which has substantial adverse effects on a person's cognitive or volitional functions." RCW 71.05.020(39).

A person may be gravely disabled in two ways: a person, as a result of a behavioral health disorder,

> (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety;

RCW 71.05.020(25).

A trial court's finding of grave disability will not be disturbed on appeal if substantial evidence supports the finding by clear, cogent, and convincing evidence. *LaBelle*, 107 Wn.2d at 209. Challenges to the sufficiency of the evidence are reviewed in the light most favorable to the

State. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459, *review denied*, 193 Wn.2d 1017 (2019).

Courts "must consider the symptoms and behavior of the respondent in light of all available evidence concerning the respondent's historical behavior." RCW 71.05.245(1). Additionally,

> great weight shall be given to evidence of a prior history or pattern of decompensation and discontinuation of treatment resulting in: (1) Repeated hospitalizations; or (2) repeated peace officer interventions resulting in . . . criminal charges, diversion programs, or jail admissions. Such evidence may be used to provide a factual basis for concluding that the individual would not receive, if released, such care as is essential for his or her health or safety.

RCW 71.05.285.

2.      Prong (a)—RCW 71.05.020(25)(a)

S.P. argues that the State failed to present clear, cogent, and convincing evidence that S.P. was in danger of serious physical harm due to his inability to provide for his own essential needs as required under RCW 71.05.020(25)(a). Specifically, S.P. argues that the State's evidence addressing both S.P.'s housing situation and malnutrition was insufficient to meet the requirements of RCW 71.05.020(25)(a). We disagree.

Under prong (a) of the grave disability statute, the State must show that the individual faces a risk "of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." RCW 71.05.020(25)(a). The State must provide tangible evidence showing the individual's inability to provide themselves with essential human needs such as "food, clothing, shelter, and medical treatment." *LaBelle*, 107 Wn.2d at 205. The State only needs to present evidence that an individual's failure to provide for at least one essential need would result in a high probability of serious physical harm. *See In re Det. of A.F.*, 20 Wn. App. 2d 115, 126-

27, 498 P.3d 1006 (2021), *review denied*, 199 Wn.2d 1009 (2022). The "inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors." *LaBelle*, 107 Wn.2d at 205.

Here, the clear, cogent, and convincing evidence shows that S.P., as a result of his mental disorder, is "in danger of serious physical harm resulting from a failure to provide" for his essential human needs such as food, shelter, and medication. RCW 71.05.020(25)(a); *LaBelle*, 107 Wn.2d at 204-05. The record shows that S.P. is unable to provide himself with adequate nutrition, even in controlled environments. Brooks testified to S.P.'s "significant weight loss" prior to his admission. VRP (Apr. 12, 2023) at 290. During a previous detention, S.P., "a thin man," lost 10 pounds in 30 days and was malnourished "due to the negative symptoms and also his delusions." VRP (Apr. 12, 2023) at 289; VRP (Apr. 11, 2023) at 196. Brooks stated that this was highly concerning because the magnitude of S.P.'s weight loss meant that S.P. was "withholding food and not having enough food intake, where [S.P.'s] daily caloric intake [was] very insufficient that result[ed] into a major weight loss." VRP (Apr. 12, 2023) at 290. Brooks further stated that the weight loss indicated that S.P. was "not getting the proper nutrients, the proper diet [S.P. was] supposed to have." VRP (Apr. 12, 2023) at 290.

S.P. expressed that, upon release from commitment, he will rely on government funds and intends to "to trade the land" to pay for food. VRP (Apr. 12, 2023) at 320. S.P. asserted that he has "never gone short on food," but also stated that he "normally survive[s] on berries, and lettuce, and tomato." VRP (Apr. 12, 2023) at 317, 322. Schaeffer also expressed concern about S.P.'s ability to provide himself with food because when an individual is "preoccupied with delusional thought content, they may not pursue something as simple as adequate nutritional intake." VRP

(Apr. 11, 2023) at 122-23. Brooks similarly testified that S.P.'s negative symptomology "could distract him from attending to . . . immediate needs" such as nutritional intake, which "could lead to further malnourishment, dehydration." VRP (Apr. 12, 2023) at 291-92. The degree of S.P.'s weight loss in a *controlled* setting where he was provided food and not intentionally trying to lose weight—and indeed, in a circumstance where it appears he should not have been trying to lose weight—demonstrates S.P.'s risk of serious physical harm from a failure to provide for an essential human need such as food.

As to serious physical harm resulting from a failure to seek shelter, Brooks testified that as a result of S.P.'s schizophrenia diagnosis, S.P. continues to experience "a lot of . . . paranoia," which "is a big barrier" to identifying resources, such as housing and "why he needs to be in a safe housing shelter." VRP (Apr. 11, 2023) at 228-29. Brooks also testified that S.P. is unable to articulate a place to go upon discharge and accordingly poses a danger to himself from a risk of exposure if he goes without shelter. Schaeffer similarly testified that if S.P. was discharged without shelter, S.P. would likely struggle to sleep and run the risk of exacerbating his symptoms. Additionally, Schaeffer stated that S.P. has told him that, based on S.P.'s delusion, he possesses $13,000 in a backpack at the Woodland Police Station, S.P. intends to rely on that money to "rent an apartment" and "the police will force the landlords to accept that money." VRP (Apr. 11, 2023) at 132-33. During trial, S.P. stated his intention to search for apartments in Woodland if discharged, that he planned to stay in a hotel during his search, and that he would pay for hotel with "the money there at the police station." VRP (Apr. 12, 2023) at 343.

And the evidence shows that S.P. is unable to provide for his medical care through medication because S.P. is unwilling to take his medication and believes that the medication is

14

trying to kill him. Both Schaeffer and Brooks testified about their concern that S.P. was unwilling to take his medication and that his failure to do so could result in "psychiatric crisis" wherein S.P. would not be able to understand when he needs immediate medical attention. VRP (Apr. 11, 2023) at 123. S.P. confirmed that he will not take prescribed medication upon release because he does not have a mental disorder and therefore does not need medication.

Nutritional intake, housing, and medication are all essential human needs that S.P. has not properly attended to either while being detained or upon release. *LaBelle*, 107 Wn.2d at 204-05. When there is a failure to provide for such essential needs like food, shelter, and medication as a result of one's behavioral health disorder, an individual is in danger of serious physical harm to themselves and can be found gravely disabled. *Id.*; RCW 71.05.020(25)(a). Moreover, the State only needs to present evidence that an individual's failure to provide for at least one essential need would result in a high probability of serious physical harm. *See A.F.*, 20 Wn. App. 2d at 126-27. S.P.'s lack of attention to his essential needs, his history of being unhoused and malnutritioned, and his unwillingness to take medication all place S.P. in danger of serious physical harm. As testified to by Schaeffer, when an individual is "preoccupied with delusional thought content, they may not pursue something as simple as adequate nutritional intake. . . [or] understand when they need medical attention." VRP (Apr. 11, 2023) at 122-23.

Substantial clear, cogent, and convincing evidence shows that S.P. is at risk of serious physical harm because he is unable to provide for his own essential needs. Therefore, we hold that sufficient evidence supports the jury's finding that S.P. is gravely disabled under prong (a).

      3.        Prong (b)—RCW 71.05.020(25)(b)

S.P. also argues that the State failed to present clear, cogent, and convincing evidence that he has shown a severe deterioration in routine functioning. Additionally, S.P. argues that the State did not prove that he has demonstrated recent significant loss of cognitive or volitional control. We disagree.

Under prong (b) of the grave disability statute, the State must show that an individual "'manifests severe [mental] deterioration in routine functioning.'" *LaBelle*, 107 Wn.2d at 208 (alteration in original) (quoting former RCW 71.05.020(1)(b) (1979)). The evidence provided must "include recent proof of significant loss of cognitive or volitional control." *Id.* "Implicit in the definition of gravely disabled . . . is a requirement that the individual is *unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment." *Id.* (emphasis in original). In addition,

> the evidence must reveal a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety. It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be *essential* to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.

*Id.* (emphasis in original). "Prong (b) represents a legislative attempt to permit 'intervention before a mentally ill person's condition reaches crisis proportions,' as it 'enables the State to provide the kind of continuous care and treatment that could break the cycle and restore the individual to satisfactory functioning.'" *In re Det. of A.M.*, 17 Wn. App. 2d 321, 335, 487 P.3d 531 (2021) (quoting *LaBelle*, 107 Wn.2d at 206).

Here, the clear, cogent, and convincing evidence shows that S.P. manifests a severe deterioration in routine functioning, as evidenced by repeated and escalating loss of cognitive and volitional control, such that if released he will not receive essential care for his health and safety. RCW 71.05.020(25)(b). The record shows that S.P. has made multiple statements expressing his belief that Telecare is harming him, including statements that Telecare put WD-40 in the air vents and that he is being "poison[ed]" by Telecare. VRP (Apr. 11, 2023) at 114. S.P. has also stated that he believes he has a tumor in his brain, even though he had been medically cleared prior to his admission to Telecare.

The evidence shows not only that S.P. does not understand the services and functionality of Telecare, but he also has an altered perception of reality. S.P. believes the he has a backpack with $13,000 at the Woodland Police Station and that he owns real property worth millions of dollars. The record shows that S.P. has attempted to act on his altered perceptions of reality. For instance, Schaeffer testified that S.P. had "tried to collect rent from somebody living on one of these pieces of land and the person threatened to kill him." VRP (Apr. 11, 2023) at 127. S.P. also believes that his father is still alive and testified to an encounter with his father at a bank, even after having attended a memorial service for his father. S.P. has continuously expressed his belief that the medications are killing him and testified that he does not intend to take any medications. Instead, S.P. testified that he will ingest marijuana upon release and that he believes marijuana will treat his psychiatric symptoms. However, both Brooks and Schaeffer testified that marijuana can exacerbate psychosis and render other psychiatric medications less effective.

S.P. has also shown a significant loss in volitional function, acting on his delusions and displaying behavior in response to internal stimuli. For example, S.P. slammed a door on a nurse

at Telecare and then attempted to throw a laptop computer in response to a request for him to take medication. S.P. has also attempted to call 911 multiple times and has requested the FBI get involved because he was "losing muscle, being starved, and . . . drugs are being forced upon him." CP at 33. S.P. refused to get into an ambulance for his commitment trial because he thought the polluted diesel would harm him.

Based on the evidence in the record, there is clear, cogent, and convincing evidence to support the finding that S.P. manifests severe deterioration of routine functioning such that if released, he would not be able to receive such care as is essential for his health or safety. S.P. has continuous delusional thoughts and responds to internal stimuli, which prevent him from receiving the care necessary for his health and safety. Indeed, S.P.'s stated intention to ingest marijuana as treatment for his psychiatric symptoms would likely worsen his symptoms overall, his belief that medications are killing him would prevent him from taking needed medications, and his interactions with others based on his altered perceptions of reality all demonstrate "severe deterioration of mental functioning," and his inability "to make a rational decision with respect to his need for treatment." *LaBelle*, 107 Wn.2d at 208. Therefore, substantial evidence supports the jury verdict finding S.P. gravely disabled under prong (b).

B.    DUE PROCESS VIOLATION

S.P. argues that the trial court violated his due process rights when the trial court did not require a majority of the jury to make the finding of grave disability under the same prong. We disagree.

1.      Legal Principles

We "may refuse to review any claim of error which was not raised in the trial court" RAP 2.5(a); *B.M.*, 7 Wn. App. 2d at 88. A party may, however, raise an issue for the first time on appeal if they present a manifest error affecting a constitutional right. RAP 2.5(a)(3); *B.M.*, 7 Wn. App. 2d at 88-89. For there to be a manifest constitutional error, "there must be a showing of actual prejudice." *B.M.,* 7 Wn. App. 2d at 89. To demonstrate actual prejudice, a party must show that the asserted error had practical and identifiable consequences during the trial. *State v. Mosteller*, 162 Wn. App. 418, 426, 254 P.3d 201, *review denied*, 172 Wn.2d 1025 (2011).

Jury trials shall consist of six jurors, "unless the parties in their written demand for jury demand that the jury be twelve in number or consent to a less number." RCW 4.44.120. In a jury panel consisting of six jurors, "when five of the jurors agree upon a verdict, the verdict so agreed upon shall be signed by the presiding juror, and the verdict shall stand as the verdict of the whole jury." RCW 4.44.380.

In civil commitment proceedings, due process guarantees are satisfied when five out of six jurors agree upon a verdict. *Dunner v. McLaughlin*, 100 Wn.2d 832, 845, 676 P.2d 444 (1984) (stating "[a]s in our review of the standard of proof required by due process, the question of jury unanimity requires a balancing of the interests of both the State and patient that are served in civil commitments against those of the detainee in wrongful commitment. To impose the requirement of jury unanimity would create an unreasonable barrier to effectuating the purposes of the act. . . . We hold that due process guaranties are satisfied when a verdict is reached by 10 members of a 12-member jury or a verdict of 5 members of a 6-member jury"); RCW 4.44.380.

2.    Waiver

S.P. claims his due process rights were violated when the trial court did not require the jurors to make the finding of grave disability under the same prong.  S.P. raises this issue for the first time on appeal, and briefly mentions RAP 2.5(a) in his brief, stating, "Because this is a manifest constitutional error, S.P. may raise it for the first time on appeal."  Br. of Appellant at 17.  S.P., however, fails to provide any further briefing on the issue.  When an appellant fails to provide argument or authority, "[w]e are not required to construct an argument on behalf of appellants."  *State v. Cox*, 109 Wn. App. 937, 943, 38 P.3d 371 (2002).

Even if S.P. had briefed the issue, S.P. fails to demonstrate a manifest error affecting a constitutional right.  RAP 2.5(a)(3); *B.M.*, 7 Wn. App. 2d at 88-89.  To show a manifest error affecting a constitutional right, S.P. must demonstrate actual prejudice from the error that had "'practical and identifiable consequence[s] [during] the trial.'"  *Mosteller*, 162 Wn. App. at 426 (quoting *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 125 (2007)).

Here, five out of six jurors found that S.P. was gravely disabled, and as discussed in the above analysis, sufficient evidence exists that S.P. is gravely disabled under both prong (a) and prong (b).  Because both *McLaughlin* and RCW 4.44.380 provide that only five out of six jurors need to agree to render a verdict in a civil commitment hearing, which is what happened here, S.P. is unable to show actual prejudice.  Therefore, S.P. fails to demonstrate a manifest error affecting a constitutional right.

Because S.P.'s due process claim is being raised for the first time on appeal and there is no showing of a manifest error affecting a constitutional right, we decline to address S.P.'s due process argument raised for the first time on appeal.

No. 58760-2-II

CONCLUSION

Sufficient evidence supports the finding of grave disability under both prong (a) and (b) of RCW 71.05.020(25). We decline to address S.P.'s due process rights argument raised for the first time on appeal. Therefore, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, J.

Cruser, C.J.

21